Mr. Lowell and Mr. Kosky. May it please the Court, I'd like to reserve three minutes for rebuttal. I'd like to frame two of the overall issues that pervade this case. I'd like to better announce your name. I'm sorry, Abby Lowell on behalf of Senator Menendez. Thank you. And then with the Court's permission... That's no problem, three minutes is fine. And with the Court's permission, I'll focus what I hope will be on the five specific acts that I think are really the subject of the appeal. So, judges, let me start by saying that if Senator Menendez introduced a bill that changed HHS policy on multidosing prescription drugs or required more screening of cargo ships, no one would argue that the government could use those acts of legislation in a bribery prosecution or to question the motive for doing so. If he called a hearing on those two subjects, that is the multidosing issue or more court security, the government or anyone would argue that you could use those acts to either prosecute a bribery case or to question his motives. So if Senator Menendez did the exact same thing and questioned the exact same policies on multidosing or court security in a meeting or in a call, why should the result be different? What happened here is it looks as if the senator was doing constituent services. Nothing wrong with that, but it doesn't get you the shield of the speech and debate clause. Senator Ambrose, when you say it looks like he's doing the constituent services... What he's doing is he's representing a constituent or a friend or he's representing someone with regard to the personal matter before an agency as opposed to either a policy or perhaps oversight, etc., and that's a factual issue, is it not? Not the way you're framing it, Judge Ambrose. You're saying he's servicing a constituent. If a constituent brought the issue of multidosing or court security to his attention and he went and did a bill or did a hearing, this court, the Justice Department, or nobody would say, I'm going to pierce through your legislative act and find out why you did it, and that is the conclusion that the district court made when your question arises because the inquiry, you don't have to look at why he did it. I don't have a surmise. I'm just telling you what the argument is. I just have to say that's what the district court did. That doesn't seem to give a fair reading to what the district court did. The district court went paragraph by paragraph through the indictment, and the government faults you for not engaging in that process. Before I ask you to turn to that, you posited a hypothetical about what would have happened if the senator had introduced a bill or held a hearing, but in fact what happened here is with the multidosing, there was a call and several efforts to get the executive branch decision makers or influencers and some legislative branch influencers and ask them specifically about this question of whether it's appropriate to use a single-dose vial and charge more than once for it when you do. So the question I've got is, is there anybody else that this pertained to besides Dr. Milken? Was there anybody else's issue in play? Was there any policy discussion about, okay, we should bill multiple times for a single-use vial? When you ask the question, I have to turn to the specific incidents that are at subject because you're asking outside of the five contacts that were made. In the contacts between Senator Menendez and Administrator Tavenner and between Senator Menendez and Secretary Sebelius, the conversations were about the overall policy of multidosing reimbursement. There was no discussion of whether it would affect ten doctors, one doctor, or 100 doctors. It was about the policy of whether there was inconsistency in multidosing. If the issue on the table pertained to one person and one person only, the background facts both within the Senator's office and within the offices of the people to whom he was directing his comments indicate that everybody understood this pertained to one person and one person only. Is that not a factual issue, which is precisely the sort of thing that this court asked the district court to undertake and look at and tease out for us on a review of a more complete record? What this court did on the real man was to ask the Justice Department to go before the grand jury judge and to have a hearing in which, and this is where I wanted to focus if I could, this court's decision that you questioned me about last time I stood at this podium as to what kind of analysis is allowed under the speech or debate clause, and you, Your Honor, and the others that day over and over again asked the Justice Department and me under the Lee case that the only inquiry that's allowed is to the content of the contents, I'm sorry, the content of the contacts, not to its purpose or its motive. And it doesn't matter if there was a legislative act. When Lilly Ledbetter came to a Senator and said there is disparate wages in America and it caused Congress to change the law, it could have affected just Lilly Ledbetter because she's the one who brought it. But that involved hearings and legislation. The question here is while possible hearings were, in the government's view, threatened, a promise to do something in the future doesn't get you coverage under speech or debate. And a threat seems like a promise or a suggestion you're going to do something in the future. Here, it's very different than the Lilly Ledbetter situation. There were no formal hearings, were there? It is not different, Judge Ambrose. Judge Sirica in his case... There were no formal hearings here. No, not that there were hearings, but... There were no formal hearings in Ledbetter. I believe there was. There certainly were. But it doesn't matter whether there was hearings. If this court decides, and it must have decided in McDade and its prior remand, and Judge Sirica's decision in the McDade case, that you don't have to have a formal hearing to come under what he calls true legislative oversight. I'm having a hard time seeing why this is true legislative oversight. Maybe you can help me on that. Well, I'm going to start with the indictment. I'm going to start one step before the indictment. If you don't accept that there is the possibility for a senator or a member of the House to talk to, meet with, and be in the room with somebody in the executive branch, outside of a formal hearing room, and that can be the equivalent of oversight, then there is no oversight. But your opinion in McDade, and McDade itself, considers the possibility that you could be out of the hearing room and write a letter to the Army. You could be out of the hearing room, and as you said, there are a range of formal, and you used the word informal, contacts with the executive branch that form protected oversight. Where do those moments begin? They're not a bill. They're not in the hearing room. They exist somewhere. And the courts of appeal that have addressed this issue have made it very clear that there are informal, in the modern day of Congress, oversight functions that are conducted just as were occurred here. You seem to be attacking a little bit of a straw man here, Cheryl, because in your briefing and here you seem to be saying that the district court said any contact with executive branch officials is ipso facto because it's between branch contact, not protected. But I just didn't read the district court's decision that way. I understood the district court to make a careful assessment of what were the character of those contacts. What was the senator trying to accomplish and looking at what the senator's own internal office notes said and what the executive branch office notes indicated, and then followed up and did what we said, quote, in our first opinion, we will rename the case of the district court to make specific factual findings about the communications implicated. So set aside the argument that any conversation or informal or formal with the executive branch is necessarily not protected because I don't think that's what the government's arguing. Maybe it is, but I didn't get that out of their briefing. And go at the factual analysis undertaken by the district court. I would like to do that with each of the five residents if I can. To start with that, though, to start with that, Judge, you said he or the court or the justice department looked at communications. To start with the most basic protected issue, you would not look at what was a piece of legislation's background. You'd look at what the legislation was that it submitted. So, yes, the district court looked at emails, but not the emails of Senator Menendez. Looked at conversations between Mr. Melvin's lawyer and lobbyist and staff members of an agency. But you yourself asked me again, what was the content? Or to use your phrase, you said, where do we look to find out, quote, what happened in the room? So what are the five rooms? The first room is cabinets. The second room is civilians. The third room is brownfield. And the fourth room is the CBP email. If you look carefully at the indictment of each of those events, you will see that the government itself has included in its indictment material that is protected by the speech or debate clause, because what happened in the room with Taverner in indictment section, indictment paragraph 200, what she said, we were discussing the policy, and the indictment reads specifically, Menendez pressed the administrator about multi-dosing and Medicaid payments. That's not Dr. Melvin's case. That's about the overall policy. If you go backwards, as the Justice Department invited everyone to do and say this was about Melvin, it was for Melvin, it was for the purpose of Melvin, two errors have occurred. The first is he types to an email that was three years before the meeting. Are you suggesting that it is contrary to the speech and debate clause to look at circumstantial evidence, that the court, the district court was confined to looking at the specific language that the senator might have used? I'm trying to get your position down. You seem to have said just a moment ago that it was two steps back error, because they looked at the communications between Dr. Melvin's lobbyist and the staff for Senator Menendez, which I think everybody would agree in some form or fashion was in the background and informing what was going to happen. It happened. Are you suggesting that it is unlawful under the speech and debate clause for a court to look at circumstantial and surrounding evidence in understanding the import or the meaning of communications between a sitting senator and executive branch officials? This court has stated, as the Supreme Court has stated, that if something is a legislative act, then you take it as a legislative act and further inquiry is not allowed. That begs the question. I'm going to have to stop there, Judge Gordon. What does Lee say? Lee says that if it is not a manifestly legislative act, you can then make an inquiry. And the inquiry that Lee says is the content of the contact. It doesn't say motive. It doesn't say intent. It says content. So, Judge Jordan, where is content? Content first is you start at the indictment, because the indictment is describing the contact. And in the Tavere case, you could take it a step further. There were two people in the room that were taking contemporaneous notes of what was said in the room. Those two people call about the four issues that were discussed about her nomination. It wasn't about multi-dosing of this one drug. It was about the Affordable Care Act. It was about the Social Security Act. It was about multi-dosing. You start there. What probative evidence would an email three years before or two years before or two weeks would be, I guess the court could look at, why don't you look further than the content of the meeting itself? Okay. Then with that important statement and concession, what we don't do is a concession, but aren't you acknowledging that we're not in the, quote, manifestly legislative category here. We're in that ambiguous category that we identified and that McVeigh also identified. And when you're in that ambiguous arena, there's a fact-finding role for a district court to play in understanding whether something is or is not a legislative act. But if the district court picks and chooses what it's going to use from the content material in the record, by, for example, a little-proof decision that what Kavanaugh said was about the issue and not the case, then you could look at the indictment in its completeness just the way the district court did. In effect, what you're saying is that the judge in making that fact-finding was clearly wrong. That's correct. I don't think he had to. First of all, I don't know what fact-finding he made. He only quoted part of an indictment. He completely lowered the contemporaneous notes. Let's just back up to the theory before we get to your five points. You don't have to worry about the time. You're on our time. Yes, sir. So you are, you have manifestly legislative acts, not legislative acts. Gray area in the middle, ambiguously legislative. When you're in the middle, doesn't Lee tell you that you can look to other factors, things that come into play that the parties talk about, in order to make a determination as to whether it fits in one or the other because it's ambiguous to start with? Not as broadly as you just said what Lee allows the inquiry to be, Judge Ambrose. What Lee says is that then, only then, in that middle category, you can look and make an inquiry into the content of the contact. And it's a word to be obtained. It later goes on and says content and purpose. But purpose is not the same as intent and motive, which is what the district court has done. So you can look at the contact. The court was talking about something that was equivalent to like a parole evidence rule? Well, I think maybe because first you look at the contract. And the contract was what did Catherine say happened? What did Menendez say happened? What did the two participants in the room say happened? What does the indictment say Sebelius said? What does Brownfield say, et cetera? If that denotes a policy-driven oversight position that's in the formal or informal category, then that's where the inquiry begins. If there was any reason to go beyond that, we told you that there are notes, contemporaneous of the meetings, which the district court didn't look at, didn't ask about, and the Justice Department, when you remanded, avoided by bringing it up because they didn't have the hearing you asked to have. If you then had no other material than what was said at the meeting or the contemporaneous notes of the meeting or what the administrator said in an FBI interview, then maybe you would go to a week before. Mr. Rule, to what Judge Ambrose just asked, it sounds like you're making a pitch that the district court judge's fact-finding was flawed. In other words, that we should say clearly erroneous. Is that what you're getting at? I guess I'm saying two things, Judge. The first is I don't know what fact he found. He made a conclusion that the purpose of this contact was to help Dr. Milgren. When he says the facts were, he says the facts were that it was, and he notes part of an indictment. Let me give you an example. This will be on the port one because it's the one that's readiest to hand for me, but it would serve as an example for the dosing one too. In pages 15 and 16 of the district court's September opinion, the court says, with Senator Menendez's repeated discussions of this specific contract dispute, the assistant secretary's characterization of this dispute as the senator's favorite case and the assistant secretary's understanding that the conversations were primarily about Dr. Milgren's case, Senator Menendez fails to meet his burden to demonstrate that the primary goal of these communications was not to lobby the executive branch to enforce Dr. Milgren's specific contract, a non-legislative activity. I read that sentence, and I take that as a summary of what's gone before, and I take that to be the district court saying, here are factual things in the record. They point to what the meaning of that meeting was, and based on that evidence, I conclude that the party with the burden of proof failed to carry it. I'm glad you picked that particular example because it's one of the most egregious examples of what the district court got wrong. He quotes, and you quoted from his opinion on that page 15, I think. 15 and 16. Correct, and what he says was he looks and he sees, based on what's in the indictment, by the way, he's quoting to the indictment, and it's true that he quotes from the indictment and says this was about a U.S. company attempting to sell a tracking and security system. He says that, and he says, and then he was quoting, that it was more a commercial mistake than a law enforcement issue, and I would agree that if that was the evidence of the meeting that occurred in May of 2012, and if that was a finding of the court, that the standard maybe is clearly erroneous, although I think the standard on review is very obscure as to whether it's clearly erroneous or when it's a constitutional right, you have to do an independent review. But let's assume it's clearly erroneous so I can answer your question. It was clearly erroneous because what the judge omitted, and you omitted because the judge omitted it, was that the assistant secretary in that email that's quoted in full in the indictment was talking about a conversation he had with Senator Menendez three months before. It is not the content of the meeting in question. As to the content of the meeting in question, if you read further in the indictment, assistant secretary Brownfield characterizes his response as being, what I understood him to be talking about was the same issue that he was talking about three months before. He doesn't put the words of Senator Menendez about. After the fact of the meeting, he writes an email and he characterizes it. Most importantly, but can't the judge look at that? It sounds like you're saying it was wrong for the judge to look at that, but why is it wrong for a judge who's trying to tease out and understand what the meaning of a communication is to consider what one of the participants in the conversation understood the meaning to be? Okay. I guess the subject of characterization of assistant secretary Brownfield after the meeting to his staff, what his motivations may be to show how tough he was may have some bearing, but that's not what his opinion did. His opinion makes it appear that this was a description of the meeting that we are challenging in the indictment because it appears that if you look at the indictment and the judge's opinion, that the context of a contract for screening and it being a commercial dispute was what they were talking about that day. They were talking about that months in advance. That day, assistant Brownfield, if you look at the same indictment, states that his response to the senator was to explain that they were engaged in a, quote, poor initiative. A poor initiative denotes an overall policy issue, not a contract of an individual person. And if there was any doubt about that, all the district court had to do and all you had to do is to go look at the interview Brownfield did where he, and if you're saying the participant in the room, describes his interaction with the senator as being a big policy issue and included drug trafficking, law enforcement, poor security, those are the ways you could determine that what was happening on May 2012 was the kind of oversight that doesn't have to happen in the hearing room and it doesn't have to happen in a piece of legislation if you accept that that kind of oversight can occur outside of those two contexts. But what the court did is to only look at some of the indictment and not the rest of it. And that you don't have to defer to because the indictment is there for you to see as well. And the same thing was done with the tavern meeting in which he omitted from his opinion the critical phrase that was in the indictment and also in the related materials, that what they were discussing was the issue underlying the dispute. And the issue underlying the dispute was the inconsistent policy of multidosing. It's not nothing, it's not his case, it's not his particular matter, it's the issue. And so you start as you instructed us to do in the Lee case by looking at content. And the only reason the court gets in the Lee case, it seems to me, was the peculiarity of Legislator Lee claiming that it was, if you will, the content of his trip, not the reason he went on the trip because the issue was whether or not his trip was official or unofficial. But if you looked at the true words of your instruction, Lee, it talks content. And as they said, Judge Norton, last time you were here, you asked what I thought were the best questions because I didn't have an opportunity to answer to Judge Waltz, which was what do you look at to determine, quote, what happens in the room? You start with the indictment saying what happens in the room. If there's any ambiguity there, you could go to the contemporaneous notes. If there's any ambiguity there, you could go to the FBI 302s. Tavern's FBI 302 says it was a policy discussion. She said it's a policy discussion. She said they debated policy. If we had had the hearing that your remand instructed with an evidentiary hearing that I requested, we would have the record that only looks to some parts of the indictment and not other parts of the indictment, and that's where we went afoul. Lee allows an inquiry, but the inquiry should be focused on the content of the contact or else what you're doing has no end. You say the piece of legislation was predictable, but I look to see why did he introduce the piece of legislation because Melvin or his lobbyists asked him to? You wouldn't do that with a piece of legislation. You wouldn't do it with a hearing. You can't do it with a form. What is the principle that you are asking us to adopt? The principle is that the issue in front of this court is when can a court inquire into when it's not a manifestly legislative act, and when that answer is it can because it's in that middle ground of McDade, how can it do that? And then this court should reiterate what it said in Lee, which is that if in that situation you then look at the content of the contact, and what would be the content of the contact? I have detailed to you a series of steps starting with what, for example, the indictment says is the content, and if there was any ambiguity there, you could go to what were the notes or then what was the FBI 302, a transferable. So look at an email that was written three years in advance. I just want to point this out if I can. Is the consequence of what you're suggesting that an apparently legislative act, asking officials at CMS about the policy with respect to multidosing, is that so? Are you suggesting that's a legislative act that you really cannot go further? If the record of the indictment, no, let me start with that. If the allegation of the indictment was in a meeting with the administrator of an executive agency, the congressman or in this case the senator engaged that person in a policy discussion over whether the agency had inconsistent rules about how they did something, that denotes a policy discussion that must be in the category that you dictated in McDade. What made the two letters in McDade different? Hang on with me. Are you saying that that is such an apparently legislative act that one cannot dig further? That you cannot? Dig further. Dig further than the content? In other words, he went into a meeting, they discussed the policy of multidosing, and the government, the court cannot go any further. That is a manifestly legislative act because on its surface it appears to be so. Is that what your argument is? I'm saying that if the court were to look at an act, be it a piece of legislation, a hearing, or an informal meeting, and determine that its content, and sometimes you can do that because a bill is a bill, and the content was about oversighting an agency, directing that they forever after will now multidose all prescription drugs, it wouldn't go further to determine what was his motive or what was his intent. Now, in this matter, if the indictment left any ambiguity as to what was the content of the meeting, there were places one could look. And then, Judge Ambrose, I suggest this court or the district court, because I think the independent review of constitutional rights that you indicated in the Horn case, should this court engage in, would allow you to look further. If you looked a little further, you would look at what happened in the room. If you looked at what happened in the room, you have record material. If you wanted to look past that, you could look at what a person said, the interview of the person. But why would you ever then go to see what some non-staffer said, or what somebody said three years before, or a week before? These can operate independently, Judge Ambrose, right? Judge Muffin can hire a lobbyist and a lawyer, and he can sue HHS, and he can lobby HHS himself, and if he hires a former administrator, that administrator can go, and it happens in Washington all the time. But it doesn't mean that a legislator can't take up the same issue and engage in a legislative activity that's protected by the speech and debate clause. What I'm trying to figure out is when can a government come in and say that X took a bribe and it's not protected by the speech and debate clause? Let me give you an example. Let's say the senator called on day one and said, don't punish Melvin. His friend of mine, it's not fair to you to apply this vague multidosing rule to him. Nothing comes of it. He just says that. He has a meeting a week or two later in which the only thing discussed is the policy of multidosing. Melvin's name never comes up, but everybody in the room knows it's about Melvin because of the conversation a couple weeks earlier. Are you saying the government can't introduce that as an ambiguously legislative act that does not deserve the shield of the speech and debate clause? I'm not saying that. I'm saying something slightly different. Okay, go ahead. So let's start with the specifics. I know you gave me a hypothetical, but it's close to the reality. So take the cabinet meeting that the calendar says was for a nomination, but even if it was not for a nomination, we think the record shows it was protected policy discussion. In the cabinet meeting, if you looked at the conversation about multidosing, it was the fourth of three other policy discussions, the Affordable Care Act, the Social Security waivers, a drug called McKenna. In that context, if somehow or another multidosing was talking about, in the context of a nomination or not, but in a policy discussion, the fact that three weeks or four weeks later, I'm sorry, earlier, there was some other context would not be dispositive. Mr. Roy, it wouldn't be dispositive, but the case was pretty clear. We've said it before more than once, said it in Menendez 1 in this case, and in this very case in the earlier iteration of it, that if you can tease out different topics, you should do that. If you can separate out things from a discussion, you can say, well, that is pertaining to a legislative act and this other thing isn't. And if it's impossible for you to separate the strands, then you focus on what's predominant. But if you can separate them, you can separate them. What the judge could be saying to us is, you can separate this. With all due respect to the court below and to your question, that's not what happened in either this opinion or in the analysis. When you said predominate, he didn't say what the predominating content was. He said the predominant purpose of the meeting was to help Melvin. That takes it outside of your instruction and lead to not go to motive intent. It doesn't matter if deep in his heart, in his brain, his motive for doing a legislative act is to help somebody. It doesn't matter. That's not the inquiry. You look at the content, and the judge below didn't do that. The judge below didn't do the kind of scalpel analysis of content that you just indicated. What he did was look at emails prior to the content to decide purpose or motive, and that's what he said he was doing. And you may not think that he had this categorical exception to influencing the executive branch, but if you look at the five acts that he does, he repeatedly says the phrase, it was an unprotected, he didn't say the word unprotected, it was an attempt to influence the executive branch, but we know from the case law in the circuit that that's not total exclusion because McDade, too, could have not been a greater attempt to influence the executive branch. It was a directive to the Department of Army to stop funding a contract, a contract that everybody in the room knew McDade was doing for somebody in his district, somebody he was accused of taking a bribe from. And yet this court in its analysis did not make that dispositive. Instead, because the contact and the content of the contact was about broader policy, it was likely protected by the speech or debate clause. So, again, the blurry between what's intent and motive spills over as to what was the content, and that is the error below. And if you look at all five events, you will see that in each of them, either the court looked to see what was the purpose of the contact or the motive of the contact or used that general categorical exception. And, moreover, there are things that you should find suspect when you ask about content. For example, the judge in the opinion below as to the cabinet contact said what was particularly significant to him was that in the cabin meeting, Senator Menendez threatened to take it upstairs above the head of cabin. So there's two things I have to say about that, which was a very significant factor to the lower court. First is, what does that one phrase say about the content of the meeting as to whether it was oversight or not? But more importantly, where would you go to get an agency to change the agency's policy short of introducing a bill? To the official above the person you're talking with. Let me throw out a – you can think about this and maybe come back and rebuttal. What if we were to say that attempts to influence the executive are unprotected, but attempts to find facts are protected? Would that be a good principle for us to adopt? I think it would be an unconstitutional principle for this court to adopt. I think it carves it way too narrowly. If you accept it, if you want to stake out the position, notwithstanding – It would be unconstitutional because? Because the facts are not the only function of oversight. It's not the only function of oversight. Congressman Lee Day wasn't gathering facts when he wrote the letter to the Army. He was telling the Army, don't award a contract until the GAO finishes its fact-finding. It was an attempt to influence the executive branch on a policy decision. You don't have to be gathering facts to be in oversight. You could have gathered your facts from a hundred different places and are ready to say I'm ready for a bill, I'm ready for a hearing, or I'm ready to avoid that formality by getting the agency to do the right thing itself. And so if you were to hold a rule that says in contacts with the executive branch, if it's only for the purposes of gathering information or privileged, but if they are for any other purpose, you will have a too narrow a definition of what is protected oversight in the modern era of the way Congress and executive branches work. And I think while it was in the reflections in the Day case, Judge Sirica, in your opinion, I read very carefully again, I would die this morning, and it says that there's a range of informal and formal contacts, and they're not about gathering information. They might be, but it doesn't define it enough. Now, it is a fuzzy area. When you get to the point of how do you know that the contact was for that purpose, not for that purpose, the content of that contact was legislative in nature. I understand that. But as every court said, this one included, there is a presumption to apply the speech or debate clause. It is supposed to be applied broadly to protect the inquiry that is not supposed to occur. And so if there's any ambiguity after you've gone to the indictment, gone to the meeting notes, gone to the FBI 302s, if there's still any ambiguity, then at that point it has to be in favor of the protection of a legislative act being protected, because that gives weight to the Supreme Court saying you applied broadly. But if you were to say the only thing that applies, Wait a minute, the Supreme Court said you need to apply it broadly, what, in Brewster? Where do they say that? The Supreme Court has said it in Hutchinson, said it in, I know the facts are always different. I mean, Gravel didn't say that, did they? No, Gravel doesn't say that, but Hutchinson says it, and Proxmire says it, and I think there's language in Tenney, the very first case that really explains it that says it. So that language is there, but that language is not what I'm putting my hook on. It's only when you get to the point of the umpteenth level of ambiguity, at that point there's a reason, and as Judge Sirica also said in his opinion, there could be places here where something happens that would not be protected by an average citizen and not a legislator. That's the price the framers made. But that's not the problem in this case. Senator Menendez, we are attacking the five contacts, two Taverner, one Sebelius, one Brownfield, and one Customs and Border Patrol. In each of those, if you look at the gradation of looking at content, the lower court either looked at purpose, looked at motive, looked at intent, did very little content analysis, and the content analysis that exists would define proper oversight as you, I think, defined it in your opinion. I think that's what the record would show, and it did not happen. That's it for Mr. Kosky. We'll get you back on rebuttal. Thank you very much. Thank you. Good afternoon. May it please the Court. My name is Peter Kosky, and I represent the United States. In rejecting Senator Menendez's assertion of a speech or debate clause, the district court did in 32 pages what Senator Menendez failed to do in 21,000 words and 17 minutes of argument, meaningfully engage the indictment. After performing a detailed paragraph-by-paragraph review of the indictment and reviewing the documents placed in the record, the district court found that Senator Menendez's communications with executive branch officials were efforts to advance Dr. Melvin's personal interests involving specific financial disputes. Mr. Kosky, I want you to respond, if you would, to a statement in the reply brief. The counsel for Senator Menendez says, in this case, DOJ ceased to turn decades of precedent on its head by relying solely upon proof of the senator's motive and legislative acts to prove bribery without any evidence of any unlawful agreement between the senator and his close personal friend, Dr. Melvin. That practice foreclosed decades ago in Johnson and Brewster. Why don't you take on directly that assertion, and what you've heard Mr. Rohl here say today, namely that the Department of Justice is trying to attack some underlying purpose and failing to come to grips with what the senator actually said and did. I have two responses. The first is that Senator Menendez errs by using the term motive differently from the way that the Supreme Court used the word motive in Johnson and uses the word motive differently than the way the district court used the word purpose in this case. Specifically in Johnson, the Supreme Court held that a corrupt motive cannot turn a legislative act into a non-legislative act, and in applying that principle to the facts of that case, ruled that Congressman Thomas Johnson's speech from the floor of the House, which is a manifestly legislative act, does not lose the protection under the speech or debate clause merely because it may have been influenced by a bribe. The district court used the word purpose in this case to refer not to what is motivating Senator Menendez in seeking to communicate with executive branch officials, but in referring to what end Senator Menendez hopes to achieve through his communications with executive branch officials. Senator Menendez seems to be using the words motive and purpose synonymously and defining them as anything outside the four corners of the conduct in question. But these words are not synonymous. They have two very different meanings. Purpose refers to the end you are trying to achieve. Motive refers to the reason you are seeking to achieve it. Nowhere in the governance brief or the district court's opinion will you find the argument that Senator Menendez's acts are unprotected by the speech or debate clause because they were motivated by Dr. Melvin's gifts. Let's take a first focus on the port security aspect. What evidence is cited in the indictment that the emails between the Senator's staff and the Customs and Border Patrol folks were not motivated by an interest in a port security issue? I'm glad that you raised that email chain because that email chain between Senator Menendez's staff and CBP I would argue is actually one of the few allegations in the indictment that is manifestly non-legislative. It doesn't even fall into that middle category. And the reason becomes clear when you compare it with the first letter in McDade. This is a letter to the Secretary of the Navy. Specifically in McDade, this court held that that first letter to the Secretary of the Navy was unprotected by the speech or debate clause because Congressman Joe McDade was openly lobbying on behalf of a specific company. Hold on just a second here. Is the discussion that the Senator has with the Assistant Secretary, is that an open lobbying for Dr. Melvin, or is it a conversation reflecting concern about port security and adequacy of port security? Certainly. So those are, just to be clear, those are two different acts, Senator Menendez in the meetings with Assistant Secretary Brownfield and the email chain with CBP. Let me get you to focus first. You just pointed out that Mr. Rohl was extensive in his remarks and noted repeatedly, look, there's, I don't know if words in his mouth. He'll get back up here and have a chance to speak in rebuttal. But I understood him to be saying there is a, even when you're in the zone, the ambiguous zone, there's a gradation of material that you could properly look at and the more attenuated, the farther out you get from what's alleged in the indictment, what the actual words were, what the commentary of people who were there say, the 302s, et cetera, the further back you get, the more the court should be concerned that you're straying into a zone that is giving inadequate protection to the speech and debate clause. That's what I understand his argument to be. So in the first instance, I'm just trying to get you to focus on the senator's conversations with the assistant secretary. Is it, is that, is him talking to the assistant secretary and saying, look, concerns about court security here, is that or is that not something that could be understood as legislative oversight falling within the protection of the speech and debate clause? Well, let me answer the ultimate question with respect to the meeting with Assistant Secretary Brownfield. That is unprotected by the speech and debate clause, but that is a communication that does fall into McDade's middle category. It's an informal contact with an executive branch official. On its face, it's neither manifestly legislative nor manifestly non-legislative, so you have to inquire into the content and purpose to determine whether or not it is protected by the speech and debate clause. Underlying your question is what do you look at, and you have to look at the record, and what's in the record here is not a transcript of the conversation. This is a historical meeting. We don't know precisely what was said or by whom, but what we do have are e-mails, contemporaneous e-mails that are setting up the meeting, e-mails not only from Senator Menendez and his staff, but e-mails from Assistant Secretary Brownfield and his staff, both describing phone calls that have been set up for the meeting, which describes Senator Menendez's interest in this, his favorite BR, court security contract, as well as follow-up meetings from Assistant Secretary's follow-up e-mails from Assistant Secretary Brownfield in which he summarized Senator Menendez to be openly lobbying on behalf of a specific company, and that's the same company that Senator Menendez and his staff are openly lobbying on behalf of in the CBP e-mail chain. Now, as I was saying earlier, I always assumed that Congressman McDade's letter to the Secretary of the Navy identified the company that he was lobbying on behalf of, United ChemCon Corporation. I went back and looked more closely at the McDade opinion, and it looks like Congressman McDade did not, in fact, do that. What he did instead was he referred to a specific contract, the seashed production contract, in Renovo, Pennsylvania, that only one company had, and that was the company United ChemCon Corporation, the company that Congressman McDade was openly lobbying on behalf of. Well, when you compare those facts, and those are the facts which led this court to conclude that that first letter of McDade is unprotected by the speech or debate clause to the CBP e-mail chain, you'll find that they're on all fours. The initiating e-mail from Senator Menendez's staffer does not identify a particular company, but it does refer to a specific private company and a specific contract that that company has. Now, unlike the McDade letter, the concluding e-mail on this chain actually identifies the name of the company, ICSI, Dr. Melvin's Company, which, in my view, based on McDade analysis, makes this e-mail chain even more manifestly non-legislative than the first letter of McDade. Let me ask you a hypothetical, if I could. Assume for a moment that the senator calls the assistant secretary of state to try to get the Dominican government to honor the contract with ICSI, I guess it's the ICSI company, Dr. Melvin's Company, and there's a competitor of that company looking to get its own contract with the government, and it loses out on the contract. Could the competitor bring a civil claim against the senator for tortious interference with contract? Well, I don't know about the merits of a tortious claim with interference with a contract, but I can give you the speech or debate analysis, and the analysis would be the same. Because it's unprotected. Because it's unprotected, exactly. It would be unprotected in a criminal context or a civil context. So are we opening up the gates here that when parties who are interested in things that are ambiguously, they're policy-related, but they're also going to have ramifications for real-world companies, you know. The world is rife with rent-seekers, perhaps, or they're legitimate business people who have concerns and are wanting to work with the government, whoever it is. You know, you can take a negative or a positive spin on it, depending on your perspective, I guess. But there are going to be disappointed parties on one side or the other. The legislators operating on policy issues that have real-world consequences for real-world companies, are they going to be hit with liability now because, son of a gun, you just get no legislative speech and debate protection if what you do implicates contracts? There are no consequences with respect to the government's position. Differently would exist in the status quo. The legal principles that you need to resolve this matter have been firmly established, and affirming the district court's opinion does not require the creation of new law. The limiting principle at issue in any speech and debate analysis is legislation, as expressed by the Supreme Court in Gravel and Brewster. Excuse me. I mean, you do state somewhere in your briefs that any attempt to influence the executive branch should not be protected. But we don't need to go that far, do we? Do we need to change our jurisprudence here in the Third Circuit? No, not at all, Judge Sirica. You don't need to go that far. And let me just clarify, that is not the government's position. I think it has been mischaracterized by the appellant here, but the district court did not rule and the government is not arguing that efforts to influence the executive branch are categorically excluded by the speech or debate clause. Nearly all the district court did, and all the government is arguing, is that the speech or debate clause does not categorically protect all efforts to influence the executive branch. It's the transposition of just a few words, but the distinction is critical. If Senator Menendez's characterization of the district court's analysis were accurate, the district court's opinion would have been one page instead of 32 pages. Of course, efforts to influence the executive branch can be protected by the speech or debate clause. This court gave examples of that in McDade, but this is not that case. As this course in a previous iteration of Senator Menendez's assertion ruled, Senator Menendez's informal contacts with executive branch officials here fall into that middle category in McDade and require the district court to look into the content and purpose. So, Judge Jordan, getting back to a question you asked me a few minutes ago, what should the district court look into in such a situation? Again, we don't have a transcript of what happened, but we do have contemporaneous e-mails and memoranda. We also have statements by some of the witnesses who participated in those meetings, and we can certainly look to and credit those statements. We can also look to and certainly credit the contemporaneous e-mails and memoranda. Do we need to develop a jurisprudence that is more particular along the lines that Mr. Lowell has suggested, or are we looking at these on a fact-by-fact situation, and each case will be determined by looking at prior cases and what was determined to be either pure legislative matters or not, or somewhere in the middle? So, it's a fact-driven analysis, Judge Sirica. As I said, all the legal principles necessary to resolve this matter have been firmly established. Affirming the district court's opinion does not require new law. As Judge Jordan asked Mr. Lowell in one of his first questions, let's get to the record. Let's look at what the district court found. It's a fact-driven analysis when conduct falls into that ambiguous middle category, and the test has to be what was articulated in McDade. The district court has to inquire into the content and purpose where conduct is neither manifestly legislative nor manifestly non-legislative because the alternative risks turning members of Congress into super-citizens immune from criminal responsibility. If everything that falls into this ambiguous middle category is protected by a speech or debate clause that Senator Menendez suggests in his briefs and also suggests during his argument, then all members of Congress have to do are insert the word policy into an e-mail or ask for a briefing at the end of a letter or write the word oversight on a calendar entry for a conversation. To the other end of the spectrum, aren't you forcing a member to present evidence to prove that a communication is legislative? Well, first, Mr. Lowell said that there's a presumption that the speech or debate clause applies. There's no presumption that the speech or debate clause applies. The speech or debate clause is a privilege like any other privilege, and this court has certainly held that as the proponent of the privilege, the burden falls on Senator Menendez to prove by preponderance of the evidence that the conduct in question is protected by the speech or debate clause. That's the test. That's the standard that the district court employed in finding that Senator Menendez has failed to meet his burden in proving by preponderance of the evidence that his conduct is protected by the speech or debate clause, and the record simply supports the district court's findings, which are not merely erroneous. What's the standard of review that we should have when we look at that record? Are we looking at that through the lens of clearly erroneous fact-finding or when we consider what the court did, do we have a broader capacity to take a fresh look at the record the way Mr. Lowell in the briefing seems to argue and alluded to at the podium? It's the former. I mean, this case presents a mixed question of fact and law, and the district court's findings of fact are subject to a clear error standard of review. The district court's legal rulings, none of which are new or novel, are subject to de novo review, but where the district court weighed into the record – Take on the Zold versus Township of Nantua case that they cite in their opening, second page of their opening brief, would you? Yeah. So in their opening brief, Senator Menendez argued that where there are constitutional facts at issue, the de novo standard of review is at play, and they cite to the Zold case. Nowhere in the Zold case could I find the term de novo, nor could I find any definition of constitutional fact that would apply in this case. In the opening brief, Senator Menendez fails to elaborate on constitutional facts or how they would have any application to review this case. Zold does say in appellate court reviewing constitutional facts, quote, may draw its own inferences from the facts in the record, close quote, its own inferences from the facts in the record. That doesn't sound like clearly erroneous review. It's certainly a more deferential standard of review whether it uses the term de novo or not. I mean, sorry, a less deferential standard of review whether it uses the term de novo or not. So what are we to make of that? How should that, if at all, impact the way we look at the record and the judge's fact finding? It shouldn't. As you noted, Judge Jordan, Senator Menendez includes a sort of vague reference to that standard of review with a citation for the case in his opening brief without any elaboration about how it would have any application here. He then seems to abandon that standard in his reply brief, and as we pointed out in our response brief, the district court here engaged in routine historical fact finding by wading into the record to determine how much weight to give certain e-mails, how much weight to give certain statements to determine whether or not certain witness statements in the form of FBI 302s are corroborated by contemporary e-mails  the purpose of Senator Menendez's meeting with Kathleen Sebelius was to advance Dr. Melvin's personal interest involving his $8.9 million Medicare billing dispute. That type of fact finding is subject to a clear error standard of review. But, I mean, the government's fallback position is regardless of what standard you use, the conclusion is the same, the record compels the same result, because the record so overwhelmingly establishes that the purpose of Senator Menendez's meeting with these executive branch officials was to advance Dr. Melvin's personal interest involving these specific financial disputes. And just to get to the record and point out a few examples, Mr. Lowell said that the district court did not have Senator Menendez's e-mails. The district court certainly did review Senator Menendez's e-mails, and let me give you some examples. There's the e-mail that Senator Menendez sent to his chief of staff, Daniel Bryan, three days after the request was made to meet with Kathleen Sebelius. Those e-mails were over their personal e-mail accounts, and in that e-mail, Senator Menendez said to his chief of staff that he has not yet informed Dr. Melvin that he has requested a meeting with Kathleen Sebelius because he doesn't want to raise Dr. Melvin's expectations in the event that the meeting falls through. The only way Dr. Melvin's expectations would be raised if he found out that they were trying to meet with Kathleen Sebelius is if that meeting were about him, is if that meeting were an effort to advance his interest. There's another e-mail from Senator Menendez that the district court reviewed, and that's the e-mail from Senator Menendez, again, to his chief of staff, where Senator Menendez said that Dr. Melvin is still in the non-litigant stage, so we need to determine who has the best juice at CMS and HHS. Well, Senator Menendez didn't realize who had the best juice at CMS. It's Marilyn Tavenner, the acting administrator at CMS, and Kathleen Sebelius, the secretary of HHS. So it's clear when you look at the record under either standard or review that the purpose of Senator Menendez's meetings were to advance Dr. Melvin's interests. The indictment alleges only non-legislative acts that are unprotective of the clause. And what makes purpose, quote-unquote, legitimate to inquire into is something that we've heard pushed back on hard by the Senator's counsel. What makes that legitimate to consider is what? That we're in the mid-zone, the ambiguous zone? Yes. So if we're in the manifestly legislative category, there's no need to inquire into purpose, because no purpose can alter the legislative character of the conduct in question. But once we're in that middle category, I see my time has expired, but I'm happy to continue. Thank you. But once we're in that middle category, the only way to balance the competing interests of the clause to protect the independence of the legislative branch while also ensuring that the clause does not turn individual members of Congress into super citizens immune from criminal responsibility is to inquire into the content and the purpose to determine what end was the Senator trying to achieve. And I want to emphasize that purpose and motive are not synonymous. They are two different things. Nowhere did the district court rule or did the government argue that Senator Menendez's acts are unprotected by the clause because of some corrupt motive? What is the difference between purpose and motive? If I say I'm motivated to do this or I say my purpose is to do that, what difference does that make? What's the distinction you're trying to draw? So let me just give the definition and the difference between the two, and then I'll emphasize. And when you do, explain whether it's got legal significance. Why are you emphasizing that there's a difference? Is there a legal consequence to it? Well, let me just give you two answers. The first is there's not a legal consequence when conduct falls into McVeigh's middle category. There's no dispute that you cannot inquire into the motive for a legislative act, but if you end the inquiry there, that assumes the answer to the ultimate question of whether these are legislative acts. If they're not legislative acts, then you can inquire into the motive all you want. So there's no legal consequence with respect to that principle's application to this case. But the reason I emphasize the difference between the two is because here, Dr. Milligan's gist and Senator Menendez's motives for calling meetings with executive branch officials were simply not part of the speech or debate analysis. The district court was instead focused on the content of what was said by reviewing the statements of people who participated in the meetings as well as the end that Senator Menendez was trying to achieve. And it's clear, Judge Jordan, one of the first questions you asked Mr. Lowell was is there evidence that there were any ophthalmologists who were similarly situated to Dr. Milligan? Well, at page 1034 of the appendix, Michael Bernards' grand jury testimony, this is Senator Menendez's senior health policy director. He makes clear that he's not aware of anyone else who's similarly situated, that Dr. Milligan is the only person that you're aware of who would have benefited from any change. Let me backtrack because I'm not following this logically. If X development happens and X development motivates or causes me to want to do something, that's something I do. I'll have a purpose at the end. But it seems like there is a difference between purpose and motivation, but I'm not sure that I'm correct and I'm not sure that you're saying you agree or disagree with what I just said. I agree with what you just said. There is a difference between purpose and motive. Purpose means in the context of this case, when Senator Menendez was meeting with Kathleen Sebelius, what was he trying to achieve? Was he trying to get some legislation passed, or was he trying to get CMS to permit Dr. Milligan to keep his $8.9 million? That's a purpose inquiry. A motive inquiry is why is Senator Menendez meeting with Kathleen Sebelius in the first place? Is it because he's being motivated by Dr. Milligan's gifts, or is he being motivated by something else? That's the difference. But to go back to the initial answer that I provided to Judge Jordan, the difference has a legal consequence in this case because if conduct falls into that middle category and it does, then you can inquire all you want into motive. Judge Ambrose, my time has expired, but I did want to address one question that you asked of Mr. Lowell that I thought was important for me. I think we gave Mr. Lowell about 35 minutes, so you can go on. Okay. Thank you. You asked what if we find that information gathering or fact-finding is protected by the speech or debate clause. So that issue has already been addressed by Lee, and Lee, this court said that legislative fact-finding is protected by the speech or debate clause. And this court defined legislative fact-finding as fact-finding or information gathering that is a prerequisite to legislation. Now, that standard has no application to the facts of this case. There's no evidence that any of Senator Menendez's communications with executive branch officials were tethered to legislation or were prerequisites to legislation that Senator Menendez was contemplating introducing the Sal Melgen Act. The evidence in the record only establishes that Senator Menendez was trying to get Dr. Melgen to keep his $8.9 million or trying to put pressure on the State Department or CDP to help Dr. Melgen enforce his contract with the Dominican Republic. Okay. Thank you very much. Thank you. Mr. Lowell? I think we've got how many minutes? One minute, Siree. Susan, give him five.  Thank you, Judge. Let me respond to specific points that were made by the Justice Department. The first question Judge Jordan asked was whether we were somewhat hyperbolic. I think maybe it wasn't your point. Is this trying to reverse decades of jurisprudence? It is in the following way. There has never been a bribery case that has been made by the Justice Department where the quote for the quid was the legislative act itself. A promise, evidence that this was something undertaken, the illicit agreement, all subject to prosecution, in Brewster, etc. This is the first time where it is the legislative act that forms the quote. But you're calling it the legislative act, right? If it wasn't the legislative act, then it is not a revolutionary prosecution. I agree. However, understand that in all the other cases that the Supreme Court and various circuit courts have looked at, what is prosecuted is the abscam tape of a person making the agreement, the briber coming and being the testifier that I made an agreement. A third party, but not this analysis of what is the legislative act itself, and that's where the slippery slope occurs, I believe. When Mr. Kosky says that the Justice Department is not doing what Judge Sirica asked, for example, stating it's so broad that no contacts are covered that seek to influence the executive branch, on page 24 of his brief in front of you, he specifically states, because the speech or debate clause is rooted in the separation of powers, its protection does not extend to legislative attempts to influence executive actions, period. Not qualified, period. When he says that he's not asking about motive, he just said he wasn't, but in his brief on page 42, the Justice Department says these e-mails, including ones that have nothing to do with what is the content of the meetings, confirm that his motivation of, in this case, the Sebelius meeting, was to advance Milton's interests. It is remarkably slippery to try to parse when the Justice Department changes between saying you can inquire as to purpose or you can inquire as to motive, because the way they do it, and more importantly, the way the district court did it, was exactly the same. When you ask about what you're not, excuse me, but when you're not dealing with what everyone would agree is a legislative act, then does it make any difference if it's motive or purpose, if we're in the middle ground? I think you never get there. Well, I don't think you ever get there. I think what you get there is to what Lee said was the content of the contact in the informal setting. If you're in the ambiguous, because it's not a bill and it's not casework, if you're in the middle, you go to the safest area to determine whether it's the equivalent of a piece of legislation, and that's the content of a contact. Not a contact three years ago, not a contact between a staff member and another staff member, what happened in the room? It's such a good question. And if you look at what happened in the room, the record evidence shows that what happened in the room were high-level policy discussions, no better than the one with Brownfield and the Department of State, where he calls it a big-picture discussion of police training, drug trafficking, and all the kinds of things that are in the heart of law enforcement. I had asked you earlier when you were up, if something like that occurred and it was on its face or apparently legislative, can the government show that, in fact, it was not? And I thought you said that the government could show that. They've done misunderstanding. It's not clear that I said it the way your question would now indicate that I did, so I'll take another swipe at it. The government can prosecute Senator Menendez with proof that the illicit agreement he entered as to why he took the legislative act of going to see Sebelius or going to see Tavenner or going to talk to Brownfield or having a staff member call or write the CBP was a lie. That's outside the legislative act. If you found that a bill was created, you wouldn't go past it. If there was a hearing, you wouldn't get past it into it. So it can have a circular as to how you decide that something is a legislative act. Let's do Senator X. Senator X is paid a bribe to get something done. Senator X tries to have this constituent or friend or whatever it is, get something done for that person as a result of the bribe. Senator X ostensibly goes for the purpose or apparently goes for the purpose of oversight, and Senator X also introduces a bill as a result of that. But Senator X is still taking a bribe. What can the government do then to prosecute? What they did in Johnson's prosecution in the United States versus Johnson. The court ruled that his contacts to the Justice Department to get them to drop specific prosecutions in, to use their phrase, no lies could be considered a legislative act, and it was outside of their decision, and it was prosecutable. But as to those acts that were in the nature of discussing policy or speech or the other actions, they separated it and said it was off limits. If Senator Menendez took a bribe to introduce a piece of legislation, the prosecution could put in evidence of the agreement to do so, but it could not use the piece of legislation to prove that the quote occurred. If in this case the government's theory is that talking to Brownfield about drug trafficking, what's coming to the courts unobserved, what are we going to do to stop things from getting into the ports of New Jersey and blowing things up is a legislative act, then that conversation can't be used. There was a lot that the district court said, and Mr. Kofke, we exchanged it. Hold on just a second, and if my colleagues will indulge me. This will be the last question and the last answer. What if in that conversation, go with me hypothetically here, he had a series of conversations about law enforcement, port security, policy issues, and then he said, you know, I really think this contract with the ICSSI, that's the best way to go. You really should absolutely make sure that the Dominican Republic sticks to that contract. If the fact that we had a whole bunch of conversation about things that are policy-related, does that insulate the specific Dr. Melgen-related comment that I've given you in that hypothetical? Not the way you phrased it to me, it would not. But that's not the facts. And the last answer, I'll extend the question to have my last answer, Judge Amber, if you'll let me. If you look at the five acts, especially the Department of State and CB3P, as Mr. Kofke indicated, was really right with day one. To use his expression, it is really on all fours with week day two, because as in your hypothetical, not so hypothetical in a part, if you look at the contact and the content of that contact with CBP, you'll find it's identical to week date. It was a congressman. He was a senator. The first letter of the day. The second letter of the day. The protected order. 738. Right. Contact the agency. Stop what you're doing until I look and find out more about what you're doing. The context of stopping what you're doing is, Judge Torton, a reference to stopping awarding the contract. The magic word contract was used. Using the word contract doesn't eliminate it from the speech or debate clause. It depends. And, by the way, enforce this contract with Melvin because it's a good thing to do, more like what you said. Let me tell you an example of the corruption of people in the Dominican Republic. They don't want port security. There's a contract in place that would do it. They don't want to enforce it. Those are two different things, one of which is talking about it in the context of how he knows to care about the Dominican Republic. The other one is helping his friend. I know the word contract can be used in both, just as it was in McDade 1 and McDade 2, but you made the distinction, so I make the distinction. You get the last word. Thank you very much. Thank you both, counsel, for very well-presented arguments. I would ask, counsel, if you would get together with the clerk's office and have a transcript made of this oral argument and to split the cost if you would. Well done. Thank you.